AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA Jessica Kim

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the cellular telephone assigned call number 614-906-0222, that is stored at premises controlled by Sprint

Case No. 2:19 mj 109

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the     Southern     District of     Ohio    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B and/or attached Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 242 | Deprivation of rights under color of law |
| 18 U.S.C. 1951 | Hobbs Act extortion |
| 18 U.S.C. 1503 | Obstruction of justice |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Robert D. Bogner, Task Force Officer, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2-6-19

*Judge's signature*

City and state: Columbus, Ohio     Hon. Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **614-906-0222**, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY **310120237623211** / ELECTRONIC SERIAL NUMBER **089594804007870547**, THAT IS STORED AT PREMISES CONTROLLED BY **Sprint** | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Robert D. Bogner, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **614-906-0222**, with International Mobile Subscriber Identity/Electronic Serial Number **310120237623211** ("the SUBJECT PHONE") that is stored at premises controlled by **Sprint**, a wireless telephone service provider headquartered at **6480 Sprint Parkway, Overland Park, Kansas 66251**. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **Sprint** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am an Inspector with the Ohio Auditor of State (AOS), where I have worked since February 2015. As an AOS Inspector, I am responsible for conducting criminal investigations involving theft, theft in office, public corruption, and other violations of law. Since February 2017, I have been deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI), Columbus Resident Agency for the Southern District of Ohio, Eastern Division. I am currently assigned to the Public Corruption Squad. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3. Prior to working as an AOS Inspector, I was a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) for 28 years. During that time, I investigated violations of the Internal Revenue laws and related offenses and was involved in numerous investigations involving violations of the United States Code. I have provided financial investigative expertise and assistance to various federal and local agencies, including the FBI, Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, and Firearms (ATF), and the Columbus Division of Police Narcotics Bureau.

4. During my tenure as a Task Force Officer with the FBI, I have been assigned to work on various types of investigations, including public corruption, financial crimes, violent crimes, narcotics offenses, and money laundering. I have experience in the execution of search warrants and the debriefing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience in the use of sophisticated investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps.

2

5. I, along with other agents and officers from the FBI, the Columbus Division of Police (CPD), the Ohio Bureau of Criminal Investigation (BCI), and the Ohio Auditor of State (AOS), have been investigating corruption in the Columbus Division of Police Department's Vice Unit involving CPD Vice Unit Detectives Steven G. Rosser and Whitney R. Lancaster. Over the course of this investigation, I have become familiar with the organization and structure of the CPD Vice Unit, as well as the nature and scope of the CPD Vice Unit's duties.

6. The facts set forth below are based upon my own observations and experience with this investigation, as well as investigative reports and information provided to me by other federal and state law enforcement officers. This affidavit is being submitted for the limited purpose of demonstrating probable cause for the requested warrant. For that reason, I have not included each and every fact known to me concerning this investigation.

## PROBABLE CAUSE

7. Based on my training and experience, as well as information obtained from (i) interviews with sources of information and other witnesses; (ii) investigative reports and arrest records; (iii) federal and state law enforcement officers; (iv) public database searches; and (v) the ongoing investigation of the CPD Vice Unit in this district, there is probable cause to believe that violations of 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1951 (Hobbs Act extortion), and 18 U.S.C. § 1503 (obstruction of justice) have been committed by Columbus Police Department ("CPD") Vice Unit Detectives Whitney R. LANCASTER and Steven G. ROSSER. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

## Operational Background of CPD Vice Unit

8. The CPD Vice Unit is charged with enforcing, among other things, prostitution-related offenses, liquor-control offenses, and compliance checks in night clubs, after-hours clubs, and adult entertainment venues. Many of these offenses are misdemeanor violations under the Ohio Revised Code. Because of the nature of the offenses, and the types of crimes being investigated, CPD Vice Unit detectives are given a broad amount of latitude while performing their duties.

## Background of Targets

9. Whitney R. LANCASTER has been a CPD officer for at least thirty years. Prior to being relieved of duty on or about December 13, 2018, LANCASTER was assigned as a detective in the CPD Vice Unit as a nuisance abatement officer; a position that was created about a year and a half ago.

10. Steven G. ROSSER has been a CPD officer since 2000. Prior to being relieved of duty on or about October 31, 2018, ROSSER was assigned as a detective in the CPD Vice Unit as a liquor compliance officer.

11. Although LANCASTER and ROSSER were officially assigned to separate shifts under separate sergeants, the investigation has revealed that they were frequently permitted by their lieutenant to work nuisance abatement and liquor compliance issues together. Investigators have learned that LANCASTER and ROSSER frequently initiated Nuisance Abatement Group (NAG) inspections on clubs to apply pressure on club owners for their personal purposes, as detailed below.

12. In or about August 2015, the FBI initiated an investigation into ROSSER after receiving information that ROSSER was using his official position to assist certain owners of

4

night clubs and adult entertainment clubs to avoid criminal charges, state and city permit violations, and has also closed clubs of competitors in exchange for cash and special favors. More recently, the FBI learned that LANCASTER has been participating in these activities with ROSSER.

### Criminal Investigation Involving Kahoots

13. Based on source debriefs and multiple recent witness interviews, investigators have learned that ROSSER and LANCASTER conspired to engage in a pattern of corrupt activities. For example, beginning in or about September 2017 through at least the summer of 2018, ROSSER and LANCASTER conspired to force the owner of Kahoots, an adult entertainment club, to rehire a recently fired champagne room host, Jeremy Sokol, who was fired after he was caught weighing marijuana in Kahoots and significantly overcharging customers' credit cards. After Sokol was rehired, multiple dancers came forward alleging that Sokol was extorting girls for money, selling drugs, and pimping girls out. Investigators learned from these sources and witnesses that LANCASTER and ROSSER used their official positions to execute citations against individuals who were named by Sokol and who were either (a) complaining about Sokol's illegal activity; or (b) posing a threat to Sokol's continuing illegal activities. LANCASTER and ROSSER used these citations as leverage against club owners, forcing them to rehire Sokol and to fire other individuals who Sokol, LANCASTER, and ROSSER deemed to pose as a threat in upending Sokol's criminal activities. Investigators have further learned that many of the individuals who were cited by LANCASTER and ROSSER had their charges thrown out and criminal records expunged.

14. Multiple witnesses and sources reported to investigators that after Sokol returned to work at Kahoots, he bragged about how the club was now "protected." One source told

5

investigators that Sokol bragged that he, ROSSER, and LANCASTER all utilize "burner" phones to communicate. This same source further told investigators that LANCASTER's brother operated an after-hours club, was a well-known drug user/dealer, and that LANCASTER shut down after-hours clubs that were competitors of his brother's after-hours club. This source also heard through some of the dancers at Kahoots that Sokol had shown them text messages Sokol had received from an Ohio Liquor Control Agent, "Darin LNU" (believed by your Affiant to be Darin Plummer), that illustrated how Sokol received advanced notification concerning potential enforcement action at Kahoots. The source added that Darin LNU was LANCASTER's "tip off guy."

### Criminal Investigation Involving Witness 1

15. In addition to the activities involving Kahoots described above, investigators have also learned that ROSSER and LANCASTER have a special relationship with club owners Jacques Diallo (a/k/a Baba) and Nick Jgenti, as well Diallo's and Jgenti's associates. These individuals have been involved with multiple after-hours clubs and adult entertainment venues. The investigation has revealed that Diallo and Jgenti are close associates, and are also involved with Mexican males associated with the Sinaloa Cartel.

16. The investigation has further revealed that LANCASTER is a close associate to Jgenti and Diallo. Diallo and Jgenti are associated with the Dollhouse, an adult entertainment club. Investigators spoke with a Dollhouse employee (Witness 1) who said she was approached in the Dollhouse by Diallo on or about April 13, 2018. Diallo asked Witness 1 if she wanted to accompany him to pick something up for the Dollhouse. Witness 1 walked out of the Dollhouse with Diallo to a silver sedan being driven by "Sonny" (known by your Affiant to be LANCASTER and later verified by Witness 1). Witness 1 entered the back of the silver sedan

6

and Diallo entered the front passenger side; no other individuals were in the vehicle. LANCASTER drove Witness 1 and Diallo on SR 161 towards Little Turtle Golf Community to a nice house in a neighborhood located off of SR 161. Investigators know this to be in close proximity to where LANCASTER's late brother, Todd Lancaster, a known drug trafficker, resided before he was shot and killed on or about April 13, 2018.

17. When they arrived at the house, LANCASTER and Diallo told Witness 1 they were going into the house to retrieve items of value before police arrived. Witness 1 recalled there were signs of evidence tape around the house, as if the house had recently been treated as a crime scene. (Your Affiant believes that the house was the residence of Todd Lancaster, LANCASTER's recently deceased brother.) Witness 1 did not know why they brought her, but thought maybe she was supposed to serve as a lookout for the police. Witness 1 remained in the vehicle when LANCASTER and Diallo went into the house. When LANCASTER and Diallo got back in the car, LANCASTER was crying and saying they couldn't find what they were looking for. When they arrived back at the Dollhouse, Witness 1 observed LANCASTER approach Jgenti crying, saying he couldn't believe they killed him. Witness 1 told investigators that Jgenti seemed to know what LANCASTER was talking about. Both Jgenti and LANCASTER appeared upset.

18. Witness 1, in addition to other witnesses, has told investigators that LANCASTER was frequently in the Dollhouse drinking and talking with Jgenti, and that LANCASTER held the wake for his brother, Todd Lancaster, at the Dollhouse.

19. A former girlfriend of Jgenti's ("Witness 2") has further corroborated the information described above. Witness 2 told investigators that she knew Todd Lancaster was a drug dealer, that Todd Lancaster and Jgenti had some dealings with one another, although they

7

did not get along well, and that Jgenti attended Todd Lancaster's funeral. According to Witness 2, she learned from Jgenti that ROSSER followed LANCASTER, Diallo, and Witness 1 to Todd Lancaster's house that night described above.

20. Your Affiant believes, given Todd Lancaster's association with Jgenti and his drug trafficking activities that LANCASTER, Diallo, and ROSSER were possibly attempting to remove evidence from the scene of Todd Lancaster's murder that could implicate LANCASTER, Jgenti, or Diallo in a drug trafficking conspiracy and/or other criminal activities.

### Criminal Investigation Involving Witness 2 and Arrest of Armenak Stepanian

21. Witness 2 has provided information to investigators regarding another incident involving LANCASTER's and ROSSER's corrupt activities. According to Witness 2, LANCASTER, ROSSER, Jgenti, and Yelena Nersesian (a part owner of the Dollhouse), conspired to plant cocaine on Armenak Stepanian, Nersesian's ex-husband and former partial owner of the Dollhouse, and have Stepanian arrested in order to coerce Stepanian into giving up his ownership interest in the Dollhouse.

22. The investigation has revealed that Stepanian was arrested for possession of cocaine (lab results pending) in the early morning hours of April 20, 2018. ROSSER subsequently prepared a CPD Form U-10-100 detailing the arrest of Stepanian for suspected possession of cocaine. Investigators have noted several inconsistencies in ROSSER's report. For example, although ROSSER claims in his report that he interviewed Witness 2 and she stated that she witnessed Stepanian in possession of cocaine that evening, Witness 2 denies ever making such statements. Witness 2 told investigators that ROSSER pretended to interview her, but it was simply a show for everyone else that was around and that no questions were truly asked.

8

23. Investigators also interviewed two uniformed CPD officers who responded to ROSSER's request for assistance at the Dollhouse that evening, revealing additional inconsistencies in ROSSER's report. In ROSSER's report, he claims that the purpose for the police action at the Dollhouse was to respond to afterhours drinking. (ROSSER also claimed this to CPD dispatch when he initially requested uniformed officer assistance.) According to the two uniformed CPD officers, however, upon arriving at the Dollhouse, ROSSER briefed them that they were responding to arrest an individual who was trafficking cocaine.

24. The two uniformed CPD officers, as well as other witnesses, further told investigators that ROSSER went straight back to the Jgenti's office in the Dollhouse and arrested Stepanian that evening. At least one witness recalled ROSSER specifically asking where Stepanian was located. This is inconsistent with what ROSSER detailed in his report, in which he indicated he was at the Dollhouse to determine if there was afterhours drinking, but happened upon Stepanian in the presence of cocaine. ROSSER's report further detailed how he observed no open alcohol in the bar and how the crew was cleaning up for the evening, thereby removing any criminal culpability for Jgenti, who was serving as the general manager at the Dollhouse that evening.

25. According to Witness 2, on the evening of Stepanian's arrest, Jgenti handed Witness 2 the cocaine that Stepanian was later arrested for, and directed her to put the cocaine out on the desk in Jgenti's office at the Dollhouse. At that time, Stepanian was at the bar of the Dollhouse waiting to meet Jgenti for a pre-determined meeting to take place in Jgenti's office regarding Stepanian's interest in the Dollhouse. Stepanian then went into Jgenti's office. Jgenti went to the bathroom almost immediately before ROSSER came in and arrested Stepanian, which Witness 2 later realized was part of the plan to place possession of the cocaine solely on

Stepanian. Witness 2 was in the office when ROSSER came back to arrest Stepanian. According to Witness 2, ROSSER winked at Witness 2 when she exited the office and ROSSER entered the office and arrested Stepanian that night.

26. On the night of Stepanian's arrest, Witness 2 observed LANCASTER circling the Dollhouse in his vehicle. According to CPD records, LANCASTER was on leave from duty through April 20, 2018, due to a death in his family, and had not yet reported back on duty. One of the uniformed CPD officers present at the scene described a black male matching the description of LANCASTER who was also present, corroborating Witness 2's account of observing LANCASTER that evening. ROSSER's report never mentions LANCASTER.

27. According to Franklin County Court records, on or about October 23, 2017, Stepanian filed a complaint with the Franklin County Court of Common Pleas against Nersesian and the Dollhouse. Court records further detail that on or about May 11, 2018, Stepanian and Nersesian went before the court, at which time Stepanian withdrew his complaint and gave up his partial ownership of the Dollhouse to Nersesian. The timing of this is significant, given that it occurred approximately 21 days after Stepanian's arrest on April 20, 2018. According to Witness 2, she knew ahead of time that Jgenti and Nersesian wanted Stepanian out of the Dollhouse; even discussing killing him. Witness 2 told investigators that Jgenti and Nersesian eventually decided to set up Stepanian with drug charges utilizing ROSSER.

28. Investigators interviewed Stepanian on or about December 19, 2018. According to Stepanian, after his arrest, both Nersesian and Jgenti told him to get out of the Dollhouse. Stepanian gave up his 33% interest in the Dollhouse and, in exchange, was given a club in Dayton by Nersesian. Stepanian told investigators that he believed his arrest for cocaine possession would have been used against him, making him ineligible to own another liquor

10

establishment, if he did not give up the Dollhouse. Stepanian later received a text message from Witness 2 in or about early September 2018, in which Witness 2 told Stepanian he had been set up by Nersesian and Jgenti.

29. Your Affiant knows, based on call detail records received via grand jury subpoena, that the assigned cellular telephone number 614-906-0222 (the SUBJECT PHONE, known by your Affiant to be LANCASTER's personal cell phone number) was in contact with ROSSER's phone at least 14 times from 11:48pm on April 19, 2018, through 4:50am on April 20, 2018, thus placing LANCASTER in contact with ROSSER throughout key times of the conspiracy to plant cocaine on and arrest Stepanian. Your Affiant believes that cell-site location information will assist investigators in determining LANCASTER's location during the time of Stepanian's arrest, potentially placing LANCASTER in the area of the Dollhouse throughout the evening of this conspiracy. These records will also serve to corroborate Witness 2's observation of LANCASTER circling the Dollhouse in the early morning hours of April 20, 2018. Of additional significance, call detail records reviewed from two of LANCASTER's phones and two of ROSSER's phones show extensive contact with Sokol, Jgenti, and Diallo.

30. Based on the foregoing, your Affiant believes that LANCASTER and ROSSER are engaged in illegal activity involving various club owners and club employees throughout the Southern District of Ohio, and that the requested cell-site location information for the SUBJECT PHONE will assist investigators in placing LANCASTER in particular places, during particular times, when he and/or ROSSER are engaged in illicit activities, including but not limited to, the arrest of Stepanian and potential removal of evidence after LANCASTER's brother, Todd Lancaster, was shot and killed.

### Additional Ongoing Investigation

31. Your Affiant knows, based on subscriber information and call detail records from Sprint, that the **assigned cellular telephone number 614-906-0222 is linked to a cellular phone IMSI #310120237623211, ESN #089594804007870547, serviced by Sprint.** LANCASTER is known to be the user of assigned cellular telephone number 614-906-0222, based on CPD's records, and based on subscriber information showing the account billing address is 5757 Schoolway Drive Hilliard, Ohio 43026, which your Affiant knows to be LANCASTER's home address.

32. In my training and experience, I have learned that **Sprint** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

33. Based on my training and experience, I know that **Sprint** can collect cell-site data about the locations(s) of the SUBJECT PHONE. I also know that wireless providers such as

12

**Sprint** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. On January 17, 2019, a preservation request was submitted to Sprint for cellular telephone number **614-906-0222**, the SUBJECT PHONE. On January 18, 2019 Sprint submitted a letter confirming receipt of the preservation request and Sprint was preserving voicemail, IP Connection logs, including cell site records, call detail records, including cell site records, subscriber information, including payment information and PCMD that were found relative to cellular telephone number **614-906-0222**, the SUBJECT PHONE.

34. Based on my training and experience, I know that wireless providers such as **Sprint** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **Sprint** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

35. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

36. I further request that the Court direct **Sprint** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on **Sprint,** who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

37. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____
Robert D. Bogner
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on February _____6_____, 2019.

_____
Honorable Chelsey M. Vascura
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to records and information associated with the cellular telephone assigned call number **614-906-0222**, with International Mobile Subscriber Identity **#310120237623211** and Electronic Serial Number **#089594804007870547** ("the Account"), that are stored at premises controlled by **Sprint** ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **January 1, 2017 to the present**:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Historical call detail records with cell site and sector information;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and PCMD;

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

       viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

       i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

       ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1951 (Hobbs Act extortion), and 18 U.S.C. § 1503 (obstruction of justice) involving **Whitney R. LANCASTER** during the period **January 1, 2017 to the present.**